USDC SCAN INDEX SHEET











SECURITY ASSETS

AMERIWEST

JAH   5/12/98   8:45
3:98-CV-00885
*1*
*CMP.*

1  Timothy H. Treadwell   SB#63037
   TREADWELL, MARR & SCHOTT
2  2100 First National Bank Building
   401 West "A" Street
3  San Diego, California  92101
   Telephone:  (619) 595-4285
4

5  Attorneys for Plaintiff
   SECURITY ASSETS CORP.
6

7

*FILED*

98 MAY 11 PM 1:36

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: J. Haslam DEPUTY

8              UNITED STATES DISTRICT COURT

9         FOR THE SOUTHERN DISTRICT OF CALIFORNIA

10                                    '98 CV  885 S  (POR)

| | |
|---|---|
| 11  SECURITY ASSETS CREDIT CORP., a | CASE NO. |
| California Corporation and sometimes doing | |
| 12  business as FDIC MANAGEMENT FUND | 1. COMPLAINT FOR BREACH OF |
| 37.5M | CONTRACT AND MONEY DAMAGES; |
| 13 | 2. NEGLIGENT MISREPRESENTATION |
|      Plaintiff, | OF MATERIAL FACT; |
| 14 | 3. INTENTIONAL MISREPRESENTATION |
| | OF A MATERIAL FACT: |
| 15  v. | 4. BREACH OF CONTRACT AND |
| | MONEY DAMAGES; |
| 16 | 5. BREACH OF CONTRACT- |
| | RESCISSION; |
| 17  AMERIWEST ENTERPRISES, INC., an | 6. NEGLIGENT MISREPRESENTATION |
| Oregon Corporation; WILLIAM M. EVANS, | OF MATERIAL FACT; |
| 18  an individual; COLLINS FINANCIAL | 7. INTENTIONAL MISREPRESENTATION |
| SERVICES, INC., a Texas Corporation; | OF A MATERIAL FACT; |
| 19  and FOURSCORE RESOURCE CAPITAL, a | 8. CONSPIRACY TO DEFRAUD |
| Minnesota Limited Liability Company; WALTER | |
| 20  COLLINS, an individual; ROGER KNUFF, an | Demand for Jury Trial |
| individual | |
| 21 | |
| 22      Defendants. | |
| 23 | |

24        Plaintiff SECURITY ASSETS CREDIT CORP, sometimes doing business as FDIC

25  MANAGEMENT FUND 37.5M, alleges  as follows:

26                        **PRELIMINARY ALLEGATIONS**

27      1.     This Court's  jurisdiction is asserted pursuant to 28 U.S.C. §1332.

28      2.     Venue with this Court is proper under 28 U.S.C. §1391(a) (2).

                                    1

1    3.    Plaintiff SECURITY ASSET CREDIT CORP is, and at all relevant times herein

2  mentioned was, a Corporation, incorporated under the laws of the State of California with offices in

3  San Diego, California, herein referenced as "SACC", and sometimes doing business as FDIC

4  Management Fund 37.5 M.

5    4.    Defendant AMERIWEST ENTERPRISES, INC.  is and at all relevant times herein

6  mentioned was a corporation organized under the laws of the State of Oregon, formerly doing

7  business as AMERIWEST BANCORP, INC., herein referenced as "AMERIWEST".

8    5.    Defendant WILLIAM M. EVANS is, and at all relevant times herein mentioned was,

9  an individual residing in Medford, Oregon, herein referenced as "EVANS".

10    6.    Defendant COLLINS FINANCIAL SERVICES, INC., is and at all relevant times

11  herein mentioned was, a corporation organized under the laws of the State of Texas with offices in

12  Austin, Texas, herein referenced as "CFSI".

13    7.    Defendant FOURSCORE RESOURCE CAPITAL, is a Limited Liability Company,

14  organized under the laws of the State of Minnesota.

15    8.    On or about December 2, 1997, Plaintiff was in the business of acquiring credit card

16  loan portfolios from various sources, for purposes of collecting monies due under such accounts, or,

17  in the alternative, selling such credit card portfolios to third parties.

18    9.    On or about December 2, 1997, Plaintiff initiated contact with AMERIWEST and

19  EVANS to determine if AMERIWEST and/or EVANS could procure, on behalf of Plaintiff, certain

20  credit card loan portfolios which configured to precise criteria, as follows:

21        a.    The entire principal balance of all accounts was not to
                exceed Forty Million Dollars ($40,000,000.00);

22
          b.    All accounts were to have been charged off by the
23              issuing creditor between the time periods 1993-97;

24        c.    No individual account within the portfolio would have a
                principal balance in excess of $7500.00;
25

26        d.    No accounts within the portfolio would relate to citizens
                of the States of Texas and Florida;
27
          e.    All accounts would be within "statute", a term of art
28              meaning that all accounts would not be barred by applicable Statute of
                Limitation defenses;

2

f.     The price for the portfolio would be between $0.015 to $ 0.018 per $100.00 of principal balance; and

g.     The accounts within the portfolio would be mostly "seconds", a term of art meaning that the accounts had been sent to no other collector's or agencies other than one time.

10.     On or about December 5, 1997, EVANS contacted individual principals of the Plaintiff that he had located a portfolio of credit card accounts, which fully complied with the criteria set forth above in paragraph 13 herein. Specifically, EVANS represented to Plaintiff that the accounts had an average balance of $4500.00, none of which included accounts from Florida and Texas, contained accounts solely from Master Card and Visa credit cards, and all had charge off dates from 1993-96, or were otherwise in "statute", and fully comported with the Account Configurations set forth within paragraph 11a through , inclusive, herein. EVANS and AMERIWEST further represented the source of these accounts came from the Federal Deposit Insurance Corporation and or a derivative "spin off" agency.

11.     On or about December 7, 1997, Plaintiff reviewed the portfolios and accounts sent by EVANS and AMERIWEST through e-mail and by floppy disc. Upon receipt, Plaintiff commenced due diligence to determine, as best a s possible, whether the accounts submitted to it, conformed with the desired criteria as more fully alleged within paragraph 9 herein.

12.     Upon receipt of the e-mail and disc, as herein alleged, Plaintiff discovered many of the accounts did not comport with the expresses criteria of Plaintiff, in that many of the account balances exceeded the principal balance of $7500.00 and contained accounts relating to debtors residing in the States of Texas and Florida.

13.     EVANS and AMERIWEST agreed to provide Plaintiff replacement accounts for their review, would delete accounts having a principal balance in excess of $7500.00 and delete accounts relating to debtors residing in the States of Texas and Florida. EVANS and AMERIWEST then e-mailed and submitted to Plaintiff, and each of them, replacement accounts during the time periods December 19, 1998 through December 26, 1998. As a result of the replacement of prior accounts previously submitted to Plaintiff, as herein alleged, the number of total accounts now consisted of approximately 25,000 in number. The data, now in the possession of the Plaintiff further indicated

3

1   new problems had developed with respect to the charge off dates of each of the accounts, in that

2   many of the accounts had been charged off in 1991-92, which was inconsistent with the express

3   criteria set forth more fully within paragraph 9 herein, and further, that many of the accounts as part

4   of the data failed to set forth a charge off date at all. Plaintiff advised EVANS and AMERIWEST

5   of the same and EVANS and AMERIWEST orally represented to Plaintiff, as follows:

6           a.      The accounts with missing charge off dates would be sent to Plaintiff
                    immediately;
7
            b.      The accounts with missing charge off dates would have charge
8                   of dates between the time periods 1993-1997; and

9           c.      The account data in the possession of Plaintiff with charge off
                    dates between the time periods of 1991 and 1992 would, in the
10                  aggregate, contain a total of ninety percent (90%) within the applicable
                    Statute of Limitations.
11

12      14.     Based upon on the review of the data, as above set forth, and the oral and repeated

13  promises of AMERIWEST and EVANS, as herein set forth, Plaintiff on or about January 6, 1998,

14  sent its representatives to Medford, Oregon to meet with EVANS and AMERIWEST. During this

15  time, EVANS and AMERIWEST again reiterated and repeated that the accounts were "in statute",

16  that is, not barred by any applicable Statute of Limitations. On or about January 7, 1998, Plaintiff

17  was advised for the first time that certain of the accounts did not entirely come from the Federal

18  Deposit Insurance Corporation, or a "spin off" agency, but rather a small portion from CFSI.

19      15.     At all relevant times herein mentioned, EVANS and AMERIWEST had represented it

20  was acting as a Seller and owned the accounts to be conveyed to Plaintiff, as below set forth.

21      16.     Based upon the oral representations of EVANS and AMERIWEST, as herein set

22  forth, and the written data provided to Plaintiff as herein alleged, Plaintiff then agreed to enter into

23  two (2) written contracts for sale of certain credit card portfolios, as follows:

24          a.      A written contract, dated January 6, 1998 but not signed until
                    January 8, 1998, by and between Plaintiff SACC and AMERIWEST
25                  for the purchase by SACC and sale by AMERIWEST of a credit card
                    portfolio consisting of 1,353 accounts with an aggregate unpaid
26                  principal balance of $1,998,649.9 for the sales price of $29,979.7, a
                    true copy of which is attached hereto as Exhibit "1" and by this
27                  reference made a part hereof.

28

4

b.     A written contract, dated January 6, 1998 but not signed until
January 8, 1998, by and between Plaintiff MANAGEMENT FUND and
AMERIWEST for the purchase by MANAGEMENT FUND and sale
by AMERIWEST of a credit card portfolio consisting of 24,325
accounts with an aggregate unpaid balance of $37,500,725.30 for the
sales price of $562,510.87, a true copy of which is attached hereto as
Exhibit "2" and by this reference made a part hereof.

17.     AMERIWEST transferred all accounts and account data to Plaintiff by electronic

transfer, received in San Diego, California on or about January 12, 1998.

18.     On or about January 15, 1998, the credit card portfolios purchased by Plaintiff, as

herein alleged (Exhibits 1 and 2), were electronically transferred by Plaintiff to Transunion Credit

Services and other entities for scoring and credit bureau review on each purchased account. Plaintiff

did not receive the final data  until February 17, 1998. At such time, and for the first time, Plaintiff

became aware of the following facts:

a.     Most of the accounts " were out of statute", that is, barred by
the applicable Statute of Limitations;

b.     The charge off dates were erroneous and unreliable in that
many of the accounts had been charged off  earlier than disclosed by
EVANS and AMERIWEST and that many, if not most, of the accounts
had been charged off ten (10) years earlier.

c.     The debtors, when contacted by collectors representing the
Plaintiff, disputed the dates of the accounts and the balances owed.

d.     The data was corrupted and unreliable, thus putting Plaintiff,
and each of them, at risk in violation of federal law governing the
collection of debt and the reporting of credit/debt transactions to
national credit bureaus, in the event they or either attempted to collect
the debt.

19.     Thereafter Plaintiff initiated a series of telephonic meetings with EVANS, and

AMERIWEST, and discovered the following:

a.     AMERIWEST had never held the portfolios for its own
account, but rather had structured  and  brokered a series of *in mesne*
transactions, wherein the accounts it sold to Plaintiff, came from three
other entities, namely CFSI and FOURSCORE, and Colorado Capital
Investment, Inc.

b.     AMERIWEST received the sum of $592,490.62 from the
Plaintiff herein, who, in turn, paid to CFSI and FOURSCORE the sum
of $525,347.27, who in turn paid to Colorado Capital Investment, Inc,
the sum of $410, 797.87.

5

1             c.     The *in mesne* transactions were subject to individual written agreements, dated January 12, 1998, and three days subsequent to the

2                  underlying sale contracts, exhibits "1" and "2", herein. A true copy of the contract by and between CFSI/ FOURSCORE and Colorado

3                  Capital Investments, Inc, is attached hereto as Exhibit "4", and by this reference made a part hereof.

4

5       20.      On or about February 16, 1998, EVANS spoke with a representative of Plaintiff and

6 EVANS finally admitted "the entire portfolio" sold to Plaintiff "came from CFSI and FOURSCORE.

7       21.      On or about February 17, 1998, Plaintiff now began in earnest several discussions

8 with AMERIWEST and EVANS to resolve the account discrepancies, as above set forth. During

9 such discussions EVANS admitted all of the charge off dates for all of the accounts sold to Plaintiff,

10 as herein alleged, came from an employee of CFSI, namely Scott Mongeau.

11       22.      On or about February 22, 1998, Scott Mongeau stated to Plaintiff that the "accounts

12 had come from Colorado Financial Services, Inc., and were in bad shape when received." Mr.

13 Mongeau also stated to Plaintiff that data from Colorado Financial Services, Inc. was corrupted and

14 contained bad data, and that he, Mr. Mongeau, had attempted to "clean -up" the data as best as

15 possible. Mr. Mongeau also told Plaintiff that he had told senior officials at CFSI not to sell these

16 accounts as the data was unreliable, out of statute and otherwise unsaleable.

17       23.      On or about February 23, 1998 Plaintiff, and each of them, contacted Mr. Stallings of

18 Colorado Capital Investment, Inc., the apparent source of the accounts purchased by Plaintiff. Mr.

19 Stallings admitted that certain of the accounts Colorado Capital Investment, Inc. had transferred to

20 CFSI and FOURSCORE were part of an overall " data- dump" and had included accounts not

21 intended to be sold, were without value, had charge off dates stemming from 1987, and were

22 otherwise accounts worked by various financial institutions on repeated occasions. Notwithstanding,

23 Plaintiff is informed and believe and thereon allege that many, if not most of the accounts sold to it

24 purportedly by AMERIWEST, were in fact assets which originated incidentally from Colorado

25 Capital Investment, Inc., and all parties upstream, including but not limited to CFSI and

26 FOURSCORE, had actual and or imputed knowledge of such facts through an employee of CFSI,

27 namely Scott Mongeau.

28

24.     On or about February 18, 1998, Walter Collins, a principal of CFSI, spoke with a representative of Plaintiff, who stated the "true" history of the transactions, was as follows:

     a.     EVANS called Walter Collins (CFSI) looking "for paper";

     b.     A firm known as Pinnacle was contacted by Walter Collins who, in turn, supplied accounts to CFSI and then to AMERIWEST accounts dated 1993 and 1994;

     c.     Mr. Collins and or his firm CFSI received the disputed 1991-92 Accounts to exchange with Pinnacle;

     d.     none of the "paper" transferred to Plaintiff was from the FDIC and or any "spin off" entity.

     e.     Pinnacle was an entity whose principle was KNAUFF; and,

     f.     Michael Stalling was the principle of Colorado Capital Investment, Inc.

25.     On or about February 23, 1998 a representative of Plaintiff contacted Michael Stalling. Mr. Stalling acknowledged he worked for Colorado Capital Investments, Inc. and was familiar with the accounts sold by it to parties upstream and eventually to Plaintiff. He stated the accounts certain of the accounts were old, came from various financial institutions, were not" seconds", had been "worked for eighteen months", and that Colorado Capital Investments, Inc., had collected more than $720,500.00 from the accounts . He further stated Colorado Capital Investments, Inc. had sent two (2) discs containing account data to CFSI, which discs contained information on portfolios in excess of $48,000,000.00. Inasmuch as Colorado Capital Investments, Inc. did not have a computer information specialist, Mr. Stalling advised Scott Mongeau of CFSI, that certain of the data stored on the two (2) discs contained account data from many sources including Citibank, which accounts had zero balances, were closed, and otherwise not to be sold by CFSI.

**FIRST CLAIM FOR RELIEF**
**Breach of Contract-Money Damages**
**Defendant AMERIWEST**

26.     Plaintiff repleads and incorporates paragraphs 1 through 25 inclusive of its Preliminary Allegations as though fully set forth herein at length.

7

27.     On or about January 8, 1998, Plaintiff and AMERIWEST entered into that certain written contract, dated January 6, 1998 (sic), wherein AMERIWEST agreed to sell, and SACC agreed to purchase certain credit card loan accounts, which contract is attached hereto as Exhibit "1".

28.     On or about February 17, 1998 Plaintiff first became aware defendant AMERIWEST materially breached the January 8, 1998 contract in that the accounts sold to Plaintiff were uncollectible, in that the majority of the accounts, if not all, were barred by the applicable Statute of Limitations, and were not "seconds", as represented by AMERIWEST.

29.     Plaintiff has done all things required of it under the terms and conditions of the written contract.

30.     Plaintiff has been damaged in an amount presently unknown, but in an amount in excess of the minimal jurisdiction of this Court for diversity actions,  in that it has suffered loss of income, loss of use, loss of prospective business advantage, loss of interest and good will and opportunity, all in an amount to be established at time of trial.

31.     As a result of the material breach as herein alleged, Plaintiff has been required to retain the services of legal counsel and is entitled to reasonable attorney fees and costs incurred of suit, in an amount to be established at time of trial.

## SECOND CLAIM FOR RELIEF
### Negligent Misrepresentation of a Material Fact
### Against Defendant AMERIWEST

32.     Plaintiff repleads and incorporates paragraphs 1 through 25, inclusive of its Preliminary Allegations, and Paragraphs 27 and 29 of its First Claim for Relief as though fully set forth herein at length.

33.     At all relevant times herein, AMERIWEST knew or should have known, exercising reasonable care and attention, that the accounts it intended to sell to Plaintiff were defective in that the accounts were not "seconds" nor were the accounts " all in statute", as such representations were made in writing  to Plaintiff .

34.     As a direct and proximate result of the negligent omission to accurately represent the true facts regarding the accounts sold to Plaintiff in that the accounts were not seconds nor all in statute, Plaintiff has been damaged in an amount presently unknown, but in an amount in excess of

8

1 the minimal jurisdiction of this Court for diversity actions, in that it has suffered loss of income, loss

2 of use, loss of prospective business advantage, loss of interest and good will and opportunity, all in an

3 amount to be established at time of trial.

**THIRD CLAIM FOR RELIEF**
**Defendant AMERIWEST and EVANS**
**Intentional Misrepresentation of a Material Fact**

6      35.      Plaintiff repleads and incorporates paragraphs 1 through 25 inclusive of its

7 Preliminary Allegations, and Paragraphs 27 and 29 of its First Claim for Relief as though fully set

8 forth herein at length.

9      36.      On and before January 8, 1998, Defendant EVANS and AMERIWEST intentionally

10 misrepresented several material facts to Plaintiff in order and as a means to induce Plaintiff to enter

11 into that certain written Agreement dated January 8, 1998, by stating:

> a.      The accounts to be sold would be "in- statute", that is, not
> barred by the applicable Statute of Limitations;
>
> b.      The accounts had been owned by a spin off entity of the Federal
> Deposit Corporation;
>
> c.      The accounts would have charge off dates no earlier than 1993;
>
> d.      The accounts within the portfolio would be mostly "seconds", a
> term of art meaning that the accounts had been sent to no other
> collector's or agencies other than one time; and
>
> e.      AMERIWEST was the owner of the accounts to be conveyed.

20      37.      The material statements as alleged in paragraph 43 were false and, at the time such

21 statements were uttered, and were known to be untrue by AMERIWEST and EVANS.

22      38.      Plaintiff fully relied upon each and every material representation made to it by

23 AMERIWEST and EVANS and was in fact induced to enter into that certain written agreement,

24 Exhibit "1" hereto.

25      39.      As a direct and proximate result of the intentional misrepresentations regarding the

26 accounts sold to Plaintiff, as herein set forth, Plaintiff has been damaged in an amount presently

27 unknown, but in an amount in excess of the minimal jurisdiction of this Court for diversity actions, in

28 that it has suffered loss of income, loss of use, loss of prospective business advantage, loss of interest

1  and good will and opportunity, all in an amount to be established at time of trial.

**FOURTH CLAIM FOR RELIEF**
**Breach of Contract-Money Damages**
**Defendant AMERIWEST**



40.     Plaintiff replead and incorporate paragraphs 1 through 25, inclusive of its Preliminary

Allegations as though fully set forth herein at length.

41.     On or about January 8, 1998, Plaintiff and AMERIWEST entered into that certain

written contract, dated January 6, 1998 (sic), wherein AMERIWEST agreed to sell, and SACC

agreed to purchase certain credit card loan accounts, which contract is attached hereto as Exhibit "2".

42.     On or about February 17, 1998 Plaintiff first became aware defendant AMERIWEST

materially breached the January 8, 1998 contract in that  the accounts sold to Plaintiff  were

uncollectible, in that the majority of the accounts, if not all, were barred by the applicable Statute of

Limitations, and were not "seconds", as represented by AMERIWEST.

43.     Plaintiff  has done all things required of it under the terms and conditions of the

written contract.

44.     Plaintiff has been damaged in an amount presently unknown, but in an amount in

excess of the minimal jurisdiction of this Court for diversity actions,  in that it has suffered loss of

income, loss of use, loss of prospective business advantage, loss of interest and good will and

opportunity, all in an amount to be established at time of trial.

45.     As a result of the material breach as herein alleged, Plaintiff  has been required to

retain the services of legal counsel and is entitled to reasonable attorney fees and costs incurred of

suit, in an amount to be established at time of trial.

**FIFTH CLAIM FOR RELIEF**
**Breach of Contract-Rescission**
**Defendant AMERIWEST**

46.     Plaintiff repleads and incorporates paragraphs 1 through 25, inclusive of its

Preliminary Allegations as though fully set forth herein at length.

47.     On or about January 8, 1998, Plaintiff and AMERIWEST entered into that certain

written contract, dated January 6, 1998 (sic), wherein AMERIWEST agreed to sell, and Plaintiff

agreed to purchase certain credit card loan accounts, which contract is attached hereto as Exhibit "2".

48.     On or about February 17, 1998 Plaintiff first became aware defendant AMERIWEST materially breached the January 8, 1998 contract in that the accounts sold to Plaintiff were uncollectible, in that the majority of the accounts, if not all, were barred by the applicable Statute of Limitations, and were not "seconds", as represented by AMERIWEST.

49.     Plaintiff has done all things required of it under the terms and conditions of the written contract.

50.     As a direct and proximate result of the material breach of the written agreement, as herein alleged, Plaintiff seeks rescission of it purchase price of $562,510.87, together with interest thereon at the legal rate of interest from January 8, 1998, until paid.

51.     As a further direct and proximate result of the material breach as herein alleged, Plaintiff has been required to retain the services of legal counsel and is entitled to reasonable attorney fees and costs incurred of suit, in an amount to be established at time of trial.

**SIXTH CLAIM FOR RELIEF**
**Negligent Misrepresentation of a Material Fact**
**Against Defendant AMERIWEST**

52.     Plaintiff repleads and incorporates paragraphs 1 through 25, inclusive of its Preliminary Allegations, and Paragraphs 48 and 50 of its Fifth Claim for Relief as though fully set forth herein at length.

53.     At all relevant times herein, AMERIWEST knew or should have known, exercising reasonable care and attention, that the accounts it intended to sell to Plaintiff were defective in that the accounts were not "seconds" nor were the accounts " all in statute", as such representations were made in writing to Plaintiff SACC.

54.     As a direct and proximate result of the negligent omission to accurately represent the true facts regarding the accounts sold to Plaintiff in that the accounts were not seconds nor all in statute, Plaintiff has been damaged in an amount presently unknown, but in an amount in excess of the minimal jurisdiction of this Court for diversity actions, in that it has suffered loss of income, loss of use, loss of prospective business advantage, loss of interest and good will and opportunity, all in an amount to be established at time of trial.

**SEVENTH CLAIM FOR RELIEF**
**Defendant AMERIWEST and EVANS**
**Intentional Misrepresentation of a Material Fact**

55.     Plaintiff repleads and incorporates paragraphs 1 through 25, inclusive of its Preliminary Allegations, and Paragraphs 47 and 49 of its fifth Claim for Relief as though fully set forth herein at length.

56.     On and before January 8, 1998, Defendant EVANS and AMERIWEST intentionally misrepresented several material facts to Plaintiff in order and as a means to induce Plaintiff to enter into that certain written Agreement dated January 8, 1998, by stating:

        a.     The accounts to be sold would be "in- statute", that is, not barred by the applicable Statute of Limitations;

        b.     The accounts had been owned by a spin off entity of the Federal Deposit Corporation;

        c.     The accounts would have charge off dates no earlier than 1993;

        d.     The accounts within the portfolio would be mostly "seconds", a term of art meaning that the accounts had been sent to no other collector's or agencies other than one time; and

        e.     AMERIWEST was the owner of the accounts to be conveyed.

57.     The material statements as alleged in paragraph 60 were false and, at the time such statements were uttered, were known to be untrue by AMERIWEST and EVANS.

58.     Plaintiff fully relied upon each and every material representation made to it by AMERIWEST and EVANS and was in fact induced to enter into that certain written agreement, Exhibit "2" hereto.

59.     As a direct and proximate result of the intentional misrepresentations regarding the accounts sold to Plaintiff , as herein set forth, Plaintiff has been damaged in an amount presently unknown, but in an amount in excess of the minimal jurisdiction of this Court for diversity actions, in that it has suffered loss of income, loss of use, loss of prospective business advantage, loss of interest and good will and opportunity, all in an amount to be established at time of trial.

60.     The intentional wrong doing of each of the Defendants AMERIWEST, EVANS and Does 1 through 10, inclusive, and each of them, as herein alleged , acted with malice, fraud and oppression in reckless disregard to the rights and duties of Plaintiff. The conduct of the Defendants,

1  AMERIWEST, EVANS and Does 1 through 10, inclusive, was outrageous and despicable and

2  warrants the award of punitive damages in an amount not less that $5,000,000.00.

3                          **EIGHTH CLAIM FOR RELIEF**
                              **Conspiracy to Defraud**
4                              **Against all Defendants**

5       61.    Plaintiff repleasds and incorporates paragraphs 1 through 25, inclusive of its

6  Preliminary Allegations as though fully set forth herein at length.

7       62.    CFSI and FOURSCORE were at all relevant times herein mentioned engaged jointly in

8  a business activity for profit, by purchasing and selling certain credit card loan portfolios. ( Exhibits

9  "3" and "4", herein).

10      63.    Defendant WALTER COLLINS is an all relevant times herein mentioned was an

11  individual residing in Austin, Texas, herein "COLLINS".

12      64.    Defendant ROGER KNUFF is and all relevant times herein mentioned was an

13  individual residing in Edenpraire, Minnesota, herein "KNUFF".

14      65.    Plaintiff is informed and believes and thereon alleges that at all relevant times herein

15  Defendants CFSI and FOURSCORE had  knowledge of the intent of AMERIWEST and/or EVANS

16  *to sell certain credit card portfolios to an unknown entity.*  CFSI possessed this  actual knowledge by

17  the fact it entered into contract with AMERIWEST to sell certain credit card portfolio accounts,

18  dated January 12, 1998, a true copy of which is attached hereto as Exhibit "3", which assets were

19  mostly sold to Plaintiff.

20      66.    Plaintiff is further informed and believes and thereon alleges, CFSI and FOURSCORE

21  had acquired most of the assets eventually sold to Plaintiff by and through a contract dated January

22  12, 1998, a true copy of which is attached hereto as Exhibit "4".

23      67.     On or about February 23, 1998 a representative of Plaintiff contacted Michael

24  Stalling. Mr. Stalling acknowledged he worked for Colorado Capital Investments, Inc. and that he

25  was familiar with the accounts sold by  it to parties upstream and eventually to Plaintiff.  He stated

26  certain of the accounts were old, came from various financial institutions, were not "seconds", had

27  been "worked for eighteen months", and that Colorado Capital Investments, Inc., had collected more

28  than $720,500.00 from the accounts . He further stated Colorado Capital Investments, Inc. had sent

1  two (2) discs of data to CFSI, which discs contained information on portfolios in excess of

2  $48,000,000.00. Inasmuch as Colorado Capital Investments, Inc. did not have a computer

3  information specialist, Mr. Stalling advised Scott Mongeau of CFSI, that certain of the data stored on

4  the two (2) discs contained account data from many sources including Citibank, which accounts had

5  zero balances, were closed, and otherwise not to be sold by CFSI.

6        68.    On or about February 22, 1998, Scott Mongeau, an employee of CFSI, stated to

7  Plaintiff that the "accounts had come from Colorado Financial Services, Inc., and were in bad shape

8  when received". Mr. Mongeau also stated to Plaintiff that data from Colorado Financial Services,

9  Inc. was corrupted and contained bad data, and that he, Mr. Mongeau, had attempted to "clean -up"

10  the data as best as possible. Mr. Mongeau also told Plaintiff that he had told senior officials, at CFSI

11  and COLLINS not to sell these accounts as the data was unreliable, out of statute and otherwise

12  unsaleable.

13        69.    The Defendants, and each of them, on or before January 8, 1998, knowingly and

14  willfully conspired and agreed amongst themselves to sell worthless credit card accounts to one

15  another and thus to Plaintiff, knowing that each would profit by its co-conspirators wrong doing.

16        70.    Each Defendant herein has subsequently ratified and the acts of wrong doing of the

17  others by accepting portions of the funds paid by Plaintiff to AMERIWEST for the purchase of

18  worthless account receivables, and has lent aid. cooperation and assistance to the other remaining

19  Defendant, so to profit wrongfully from the intentional sale of worthless accounts to Plaintiff herein.

20        71.    As a direct and proximate result of the wrong doing of each of the Defendants herein,

21  as herein alleged, Plaintiff has been damaged in an amount of $592,490.62, together with interest

22  thereon from January 9, 1998.

23        72.    As a further direct and proximate result of the wrong doing of each of the

24  Defendants herein, as herein alleged, Plaintiff has been damaged in that it has suffered loss of income,

25  loss of use, loss of prospective business advantage, loss of interest and good will and opportunity, all

26  in an amount to be established at time of trial.

27        73.    The intentional wrong doing of each of the defendants, as herein alleged, was

28  calculated to cause injury to plaintiff, and the defendants, and each of them, as herein alleged, acted

1   with malice, fraud and oppression in reckless disregard to the rights and duties of Plaintiff.   The

2   conduct of the Defendants, and each of them, as herein alleged, was outrageous and despicable and

3   warrants the award of punitive damages in an amount not less than $5,000,000.00.

4

5       **WHEREFORE**, Plaintiff prays judgement, as follows:

6   **1.**      **First Claim of Relief-(Against AMERIWEST)**

7           a.      For actual damages based upon breach of contract in an amount equal to

8                   proof, including loss of profit, loss of use, loss of good will and opportunity,

9                   all in an amount to be established at the time of trial.

10          b.      For such other and further relief as this Court deems just and proper.

11  **2.**      **Second  Claim of Relief-(Against AMERIWEST)**

12          a.      For actual damages based upon breach of contract in an amount equal to

13                  proof, including loss of profit, loss of use, loss of good will and opportunity,

14                  all in an amount to be established at the time of trial.

15          b.      For such other and further relief as this Court deems just and proper.

16  **3.**      **Third Claim of Relief-(Against AMERIWEST and EVANS)**

17          a.      For actual damages based upon breach of contract in an amount equal to

18                  proof, including loss of profit, loss of use, loss of good will and opportunity,

19                  all in an amount to be established at the time of trial.

20                  b.      For such other and further relief as this Court deems just and proper.

21  **4.**      **Fourth  Claim of Relief-(Against AMERIWEST)**

22          a.      For actual damages based upon breach of contract in an amount equal to

23                  proof, including loss of profit, loss of use, loss of good will and opportunity,

24                  all in an amount to be established at the time of trial.

25          b.      For such other and further relief as this Court deems just and proper.

26

27

28

15

5. __Fifth Claim of Relief__-(Against AMERIWEST)

    a.    For rescission of the purchase price of $526,510.87, together with interest thereon at the legal rate from January 8, 1998, through date of judgement, inclusive;

    b.    For such other and further relief as this Court deems just and proper.

6. __Sixth Claim for Relief__-(Against AMERIWEST)

    a.    For actual damages based upon breach of contract in an amount equal to proof, including loss of profit, loss of use, loss of good will and opportunity, all in an amount to be established at the time of trial.

    b.    For such other and further relief as this Court deems just and proper.

7. __Seventh Claim for Relief__- ( Against AMERIWEST and EVANS)

    a.    For actual damages based upon breach of contract in an amount equal to proof, including loss of profit, loss of use, loss of good will and opportunity, all in an amount to be established at the time of trial.

    b.    For punitive damages in an amount not less than $3,000,000.00; and

    c.    For such other and further relief as this Court deems just and proper.

8. __Eighth Claim for Relief__- (Against all Defendants)

    a.    For actual damages based upon breach of contract in an amount equal to proof, including loss of profit, loss of use, loss of good will and opportunity, all in an amount to be established at the time of trial.

    b.    For punitive damages in an amount not less than $3,000,000.00; and

    c.    For such other and further relief as this Court deems just and proper.

TREADWELL, MARR & SCHOTT
Attorneys at Law

DATED: __5/6__, 1998

BY: _____
Timothy H. Treadwell, Esq.
Attorneys for Plaintiff

16

Recycled Paper

BLUEBIRD

**F.D.I.C.**
**LOAN PORTFOLIO**
**PURCHASE AGREEMENT**

THIS PURCHASE AGREEMENT (the "Agreement") is made and entered into effective as of the 6<u>th</u> day of <u>January</u>, 1998 by and between AmeriWest Enterprises, Inc. ("**Seller**"), whose address is 93 Northridge Terrace, #50, Medford, Oregon 97501 and ("**Buyer**") whose name is <u>Security Asset Credit Corp.</u>, whose address is <u>701 "B" Street, Suite #1725, San Diego, California 92101.</u>

**ARTICLE I**
DEFINITIONS

1.1 "Accounts" means certain of the Seller's owned Loan Portfolio accounts or other charged-off loan accounts that the Seller holds right, title and interest in and which are to be sold pursuant to this Agreement.

1.2 "Debtors" means all parties obligated on the Accounts.

1.3 "Closing Date" means the date that liquid funds, in the amount of the Purchase Price, are received and the Purchase Agreement is signed by both Buyer and Seller.

1.4 "Purchase Price" means the amount specified in <u>Exhibit "B"</u> below.

1.5 "Predecessors" means any entities (Previous Seller's or Previous Owner's) having ownership of an Account by Seller.

1.6 "Original Creditor" means the original grantor of credit to the Debtor.

1.7 "Successor" means any party that an Account is sold to, traded to or given to by the Buyer.

**ARTICLE II**
AGREEMENT TO SELL AND PURCHASE

2.1 AGREEMENT TO SELL AND PURCHASE. For and in consideration of the Purchase Price and the covenants herein contained, Seller agrees to sell, assign, transfer and convey to Buyer, and Buyer agrees to purchase from Seller, on the terms and conditions set forth herein, all right, title and interest of Seller in and to the Accounts and as further described in the portfolio ("Portfolio") which is attached as <u>Exhibit "A"</u>.

**ARTICLE III**
WARRANTIES AND REPRESENTATIONS

3.1 WARRANTIES AND REPRESENTATIONS. Buyer has made an independent investigation as Buyer deems necessary as to the nature, validity, collectibility,

1

enforceability and value of the Accounts, and as to all other facts that the Buyer deems material to Buyer's purchase. Buyer enters into this Agreement solely on the basis of that investigation and Buyer's own judgment. Buyer is not acting in reliance upon any representation by the Seller, other than as stated in this Agreement, including without limitation, the representations set forth in 3.1 (a) below. The transfer provided for in Paragraph 5.1 shall be expressly made without recourse or representation as to the character, accuracy or sufficiency of information furnished to Buyer, expressed or implied.

    (a) Seller has good and indefeasible title, free from liens and claims to Accounts being sold.

    (b) Seller agrees to buy back Loans over a sixty (60) day period from the Sale Date in where the following has occurred:

        (1) Bankruptcy
        (2) Deceased (no estate)
        (3) Paid/Settled prior to Sale
        (4) Fraud

    (c) To the best of Seller's knowledge, all balances, names, and other information conveyed with accounts are true and accurate. All accounts are represented as 2nd's and are within statute.

    (d) Seller warrants that accounts have not been subject to any adverse selection or scoring.

3.2 POST CLOSING PAYMENTS. In the event Seller receives any money on an Account on or after the Closing Date, Seller shall remit such monies to Buyer without offset or reduction.

## ARTICLE IV
### PURCHASE PRICE AND PAYMENT TERMS

4.1 PURCHASE PRICE. The Purchase Price for this Portfolio is calculated based on cents per dollar of the outstanding balance of the Portfolio, as reflected in "Exhibit B" (Closing Statement).

## ARTICLE V
### CLOSING PROCEDURES

5.1 BILL OF SALE. Seller will sign "Exhibit C" (Assignment and Bill of Sale) for all assets listed in "Exhibit A". Upon receipt of liquid funds in the amount of the Purchase Price and the Purchase Agreement is signed by both Buyer and Seller. Seller will send the Bill of Sale to Buyer by mail. Buyer assumes full responsibility for the Portfolio following the Closing Date.

5.2 SHIPPING OF FILES. Within five (5) business days of receipt and delivery of the Purchase Price and completion of this agreement, Seller will send hard copies or

diskette(s) or use modem transfer or via the Internet that contain the following information, if available, to Buyer:

a.  Debtor name
b.  Debtor address and phone number
c.  Debtor social security number
d.  Credit card name
e.  Credit card type
f.  Credit card number
g.  Charge off date
h.  Last payment date
i.  Charge off balance
j.  Issue date

5.3  MEDIA.  For the purpose of this section Media refers to Applications, Acceptance Certificates, Agreements, Account or Billing Statements and Balance Affidavits.

> a).  All immediately available Media in the possession of Seller will be provided in the sale and no later than forty five (45) days from Closing Date.

> b).  The Seller will use its best effort to obtain and provide, if available, additional Media, which must be ordered form the Original Issuer. We will charge the Purchaser for the actual expense charged by the Issuer. The cost of obtaining the Media must be paid by the Purchaser prior to ordering.

## ARTICLE VI
## GENERAL CONDITIONS

6.1  BUYER'S INDEMNIFCATION.  Buyer agrees to indemnify and hold Seller and its Predecessors (including their Officers, Directors, Employees, Stockholders, Agents, Partners and Principals) harmless from and against any claim, actions, suits or other actual proceedings, and all losses, judgments, damages, expenses or other costs (including all fees and disbursements of Counsel) incurred or suffered by Seller and its Predecessors by reason of negligent or willful misconduct or violation of any applicable law, rule or regulation by Buyer (or its employees or agents) in connection with the collection or enforcement of the Accounts.

SELLER'S INDEMNIFICATION.  Seller agrees to indemnify and hold Buyer (including their Officers, Directors, Employees, Stockholders, Agents, Partners and Principals) harmless from and against any claims, actions, suits or other actual proceedings, and all losses, judgments, expenses or other costs (including all fees and disbursements of Counsel) incurred or suffered by Buyer by reason of negligent or willful misconduct or violation of any applicable law, rule or regulation by Seller (or its employees or agents) in connection with the collection or enforceability or sale of Accounts.

3

6.2 LIMITATION OF LIABILITY. Seller and Buyer shall not be liable nor assume any obligation for incidental consequential or special damages of any kind, related to lost profit, lost revenue, cost of capital, use of capital and/or lost services.

6.3 NO CONFLICT. To the best of Buyer's knowledge, Buyer's review of Account and Debtor information will not represent a conflict of interest on the part of the Buyer or Buyer's officers or employees, and that neither Buyer nor any of Buyer's affiliated companies is presently a party to litigation, or involved in any litigation, with any Debtor or with the Seller or it's Predecessors.

6.4 NO BROKERS OR FINDERS. The Seller has not employed any investment banker, broker or finder in connection with the transaction contemplated in this Agreement who might be entitled to a fee or commission from the Seller upon consummation of the transaction contemplated in this Agreement. Any fee or commission due a broker or finder employed by the Buyer will be the responsibility of the Buyer. Buyer has not employed a broker, and is not responsible for any commissions.

6.5 COLLECTION OF ACCOUNTS. If Buyer collects or attempts to collect on any Account, Buyer will at all times:

    (a) Comply with all state and federal laws applicable to debt collections including, the Consumer Credit Protection Act, the Fair Credit Reporting Acting and the Fair Debt Collection Practices Act; to the extent Buyer is subject to said laws and Acts.

    (b) Shall not use the name of Seller or any of Seller's Predecessors in any way in the operation of its collection of the Accounts, including but not limited to checks, drafts, letters and forms except that Buyer may refer to an Account in the body of a Collection letter as an account purchased from Seller or originally issued by a predecessor of Seller. Buyer may refer to the Seller and its Predecessor as transferor in any lawsuit filed by Buyer.

6.6 NOTICE OF CLAIM. Buyer shall immediately notify Seller in writing of any claim against Seller or it's Predecessor that may come to its Buyer's attention.

6.7 BUYER'S REPRESENTATION OF CAPACITY. Buyer and/or the undersigned authorized agent of Buyer represents that all laws, rules, regulations, charter provisions and by-laws have been duly complied with and that such representative is duly authorized to act on behalf of and bind Buyer to the terms of this Agreement.

### ARTICLE VII
### SELLER OR IT'S PREDECESSOR AS A WITNESS

7.1 SELLER AS A WITNESS. If Buyer files legal action to collect on an Account and requests or subpoenas an officer or employee of the Seller to appear at a trial, hearing or deposition to testify about an Account, Buyer will pay the Seller for its time in traveling to, attending and testifying at the trial, hearing or deposition, whether or not the Seller is called as a witness, at the Seller's standard daily rate at a reasonable rate not to exceed $150.00 per hour. Buyer will also reimburse the Seller for the Seller's out-of-pocket travel-related expenses.

4

7.2 SELLER'S PREDECESSOR AS A WITNESS. Refer to/same as 7.1 (above).

## ARTICLE VIII
## USE OF THE ORIGINAL CREDITOR'S NAME

8.1 USE OF ORIGINAL CREDITOR'S NAME. Buyer and it's Successors will not use or refer to the Original Creditor's name for any purpose relating to any Account including, without limitation, the promotion, marketing or advertising of any Account. However, Buyer may use the Original Creditor's name for purposes of identifying an Account in communications with the Account's cardholder in order to collect amounts outstanding on the Account in accordance with Paragraph 9.1 below. Buyer may use the Original Creditor and Seller name as the transferor in any lawsuit filed by Buyer.

## ARTICLE IX
## MISCELLANEOUS TERMS

9.1 NOTICES. All notices and other communications between the parties will be in writing and will be deemed given when delivered personally or four (4) days after mailed by registered or certified mail, return receipt requested, to a party at its address set forth below, or to any other address as a party may designate in writing:

> **TO BUYER:** Security Asset Credit Corp.
> **ATTENTION:** Darrell Musick
>
> **TO SELLER:** AmeriWest Enterprises, Inc.
> **ATTENTION:** William M. Evans

9.2 SUCESSORS AND ASSIGNS. This Agreement will bind and insure to the benefit of Buyer and the Seller and their respective successors and assigns.

9.3 EXPENSES. Except as otherwise expressly provided in this Agreement, Buyer and Seller will each dear its own out-of-pocket expensed in connection with the transaction contemplated by this Agreement.

9.4 ENTIRE AGREEMENT. This Agreement embodies the entire agreement and understanding between the parties and supersedes all prior agreements and understandings relating to the subject matter of this Agreement. The parties make no representations or warranties to each other, except as contained in this Agreement or the accompanying exhibits or the certificates or other closing documents delivered according to this Agreement. All prior representations and statements made by any party or its representatives, whether verbally or in writing, are deemed to have been merged into this Agreement.

9.5 AMENDMENT. Neither this Agreement nor any of its provisions may be changed, waived, discharged or terminated orally. Any change, waiver, discharge or

5



termination may be effected only by a writing signed by the party against which enforcement of such change, waiver, discharge or termination is sought.

9.6 GOVERNING LAW; SEVERABILITY.  Oregon law governs this Agreement.  If any one or more of the provisions of this Agreement, for any reason, illegal or unenforceable, the invalidity, illegality or unenforceability will not affect any other provision of this Agreement, and this Agreement will be construed without the invalid, illegal or unenforceable provision.

9.7 WAIVERS, etc.  No waiver of any single breach or default will be deemed a waiver of any other breach or default of this Agreement.  All rights and remedies, either under this Agreement or by law or otherwise afforded to a party, will be cumulative and not alternative.

9.8 HEADINGS.  Paragraph headings are for reference only, and will not affect the interpretation or meaning of any provision of this Agreement.

9.9 COUNTERPARTS.  This Agreement may be signed in one or more counterparts, all of which taken together will be deemed one original.

**IN WITNESS WHEREOF,** the parties have executed this Agreement by their duly authorized officers as of the date first shown above.


SELLER:  AmeriWest Enterprises, Inc.

BY:  William M. Evans

DATE:  January 6, 1998

TITLE:  President & Chief Executive Officer


BUYER:  Security Asset Credit Corp.

BY:  Darrell Musick

DATE: X  1-8-1998

TITLE:  Portfolio Manager


6

termination may be effected only by a writing signed by the party against which enforcement of such change, waiver, discharge or termination is sought.

9.6 GOVERNING LAW; SEVERABILITY. Oregon law governs this Agreement. If any one or more of the provisions of this Agreement, for any reason, illegal or unenforceable, the invalidity, illegality or unenforceability will not affect any other provision of this Agreement, and this Agreement will be construed without the invalid, illegal or unenforceable provision.

9.7 WAIVERS, etc. No waiver of any single breach or default will be deemed a waiver of any other breach or default of this Agreement. All rights and remedies, either under this Agreement or by law or otherwise afforded to a party, will be cumulative and not alternative.

9.8 HEADINGS. Paragraph headings are for reference only, and will not affect the interpretation or meaning of any provision of this Agreement.

9.9 COUNTERPARTS. This Agreement may be signed in one or more counterparts, all of which taken together will be deemed one original.

**IN WITNESS WHEREOF,** the parties have executed this Agreement by their duly authorized officers as of the date first shown above.

SELLER: AmeriWest Enterprises, Inc.

BY: William M. Evans

DATE: January 6, 1998

TITLE: President & Chief Executive Officer

BUYER: Security Asset Credit Corp.

x

BY: Darrell Musick

DATE: x  1 - 8 - 1998

TITLE: Portfolio Manager

This contract dated January 8, 1998 supercedes any and all other contracts made between the parties.

6

**EXHIBIT "A"**

1,353 Accounts with a past due amount of $1,998,649.99  Sale price $29,979.75.

Total of this Invoice  $29,979.75.

    a)  one diskette (total inventory), of said portfolio.

    b)  one print out (total inventory), of said portfolio.

Exhibit "B"

Closing Statement

Portfolio Invoice:  $1,998,649.99

Number of Accounts: 1,353

Outstanding Balance:  $1,998,649.99

Purchase Price:  $29,979.75.

Purchaser shall pay to Seller, by wire transfer or otherwise immediately available funds, the amount of 29 Thousand 9 Hundred 79 Dollars and 75/100.

Funds may be wired as follows:

**Bank Name:**  Well's Fargo Bank

**Bank Address:**  1128 South Riverside Ave.
                        Medford, Oregon 97501

**ABA (Routing) Number:**  121-000-248

**Credit Bank Account Name:**  AmeriWest Enterprises, Inc.

**Credit Bank Account Number:** 0166-804195

**Description:**  Business

8

# EXHIBIT "C"

## PORTFOLIO INVOICE
## ASSIGNMENT AND BILL OF SALE

AmeriWest Enterprises, Inc. ("Seller"), has entered into a F.D.I.C. Loan Portfolio Purchase Agreement, dated 6th day of January, 1998 ("Agreement") for the sale of Accounts described in "Exhibit A" thereof to Security Asset Credit Corp. ("Buyer"), upon the terms and conditions set forth in that Agreement.

**NOW, THEREFORE,** for good and valuable consideration, Seller hereby sells, assigns, and transfers to Buyer, its successors and assigns, all of Seller's rights, title and interest in each and every one of the Accounts described in the Agreement.

Buyer and Seller agree that the Purchase Price shall be as stated in "Exhibit B", attached to the Agreement.

**IN WITNESS WHEREOF,** Seller has signed and delivered this instrument on the 6th day of January, 1998.

BY: _____
William M. Evans

TITLE: President & Chief Executive Officer

9

# F.D.I.C.
# LOAN PORTFOLIO
# PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT (the "Agreement") is made and entered into effective as of the 6<u>th</u> day of <u>January</u>, 1998 by and between AmeriWest Enterprises, Inc. ("**Seller**"), whose address is 93 Northridge Terrace, #50, Medford, Oregon 97501 and ("**Buyer**") whose name is <u>F.D.I.C. Management Fund 37.5M</u>, whose address is <u>701 "B" Street, Suite #1725, San Diego, California 92101.</u>

## ARTICLE I
## DEFINITIONS

1.1 "Accounts" means certain of the Seller's owned Loan Portfolio accounts or other charged-off loan accounts that the Seller holds right, title and interest in and which are to be sold pursuant to this Agreement.

1.2 "Debtors" means all parties obligated on the Accounts.

1.3 "Closing Date" means the date that liquid funds, in the amount of the Purchase Price, are received and the Purchase Agreement is signed by both Buyer and Seller.

1.4 "Purchase Price" means the amount specified in <u>Exhibit "B"</u> below.

1.5 "Predecessors" means any entities (Previous Seller's or Previous Owner's) having ownership of an Account by Seller.

1.6 "Original Creditor" means the original grantor of credit to the Debtor.

1.7 "Successor" means any party that an Account is sold to, traded to or given to by the Buyer.

## ARTICLE II
## AGREEMENT TO SELL AND PURCHASE

2.1 AGREEMENT TO SELL AND PURCHASE. For and in consideration of the Purchase Price and the covenants herein contained, Seller agrees to sell, assign, transfer and convey to Buyer, and Buyer agrees to purchase from Seller, on the terms and conditions set forth herein, all right, title and interest of Seller in and to the Accounts and as further described in the portfolio ("Portfolio") which is attached as <u>Exhibit "A"</u>.

## ARTICLE III
## WARRANTIES AND REPRESENTATIONS

3.1 WARRANTIES AND REPRESENTATIONS. Buyer has made an independent investigation as Buyer deems necessary as to the nature, validity, collectibility,

1

enforceability and value of the Accounts, and as to all other facts that the Buyer deems material to Buyer's purchase. Buyer enters into this Agreement solely on the basis of that investigation and Buyer's own judgment. Buyer is not acting in reliance upon any representation by the Seller, other than as stated in this Agreement, including without limitation, the representations set forth in 3.1 (a) below. The transfer provided for in Paragraph 5.1 shall be expressly made without recourse or representation as to the character, accuracy or sufficiency of information furnished to Buyer, expressed or implied.

    (a) Seller has good and indefeasible title, free from liens and claims to Accounts being sold.

    (b) Seller agrees to buy back Loans over a sixty (60) day period from the Sale Date in where the following has occurred:

        (1) Bankruptcy
        (2) Deceased (no estate)
        (3) Paid/Settled prior to Sale
        (4) Fraud

    (c) To the best of Seller's knowledge, all balances, names, and other information conveyed with accounts are true and accurate. All accounts are represented as 2nd's and are within statue.

    (d) Seller warrants that accounts have not been subject to any adverse selection or scoring.

3.2 POST CLOSING PAYMENTS. In the event Seller receives any money on an Account on or after the Closing Date, Seller shall remit such monies to Buyer without offset or reduction.

## ARTICLE IV
### PURCHASE PRICE AND PAYMENT TERMS

4.1 PURCHASE PRICE. The Purchase Price for this Portfolio is calculated based on cents per dollar of the outstanding balance of the Portfolio, as reflected in "Exhibit B" (Closing Statement).

## ARTICLE V
### CLOSING PROCEDURES

5.1 BILL OF SALE. Seller will sign "Exhibit C" (Assignment and Bill of Sale) for all assets listed in "Exhibit A". Upon receipt of liquid funds in the amount of the Purchase Price and the Purchase Agreement is signed by both Buyer and Seller. Seller will send the Bill of Sale to Buyer by mail. Buyer assumes full responsibility for the Portfolio following the Closing Date.

5.2 SHIPPING OF FILES. Within five (5) business days of receipt and delivery of the Purchase Price and completion of this agreement, Seller will send hard copies or

diskette(s) or use modem transfer or via the Internet that contain the following information, if available, to Buyer:

a.  Debtor name
b.  Debtor address and phone number
c.  Debtor social security number
d.  Credit card name
e.  Credit card type
f.  Credit card number
g.  Charge off date
h.  Last payment date
i.  Charge off balance
j.  Issue date

5.3  MEDIA.  For the purpose of this section Media refers to Applications, Acceptance Certificates, Agreements, Account or Billing Statements and Balance Affidavits.

>   a).  All immediately available Media in the possession of Seller will be provided in the sale and no later than forty five (45) days from Closing Date.

>   b).  The Seller will use its best effort to obtain and provide, if available, additional Media, which must be ordered form the Original Issuer.  We will charge the Purchaser for the actual expense charged by the Issuer. The cost of obtaining the Media must be paid by the Purchaser prior to ordering.

### ARTICLE VI
### GENERAL CONDITIONS

6.1  BUYER'S INDEMNIFCATION.  Buyer agrees to indemnify and hold Seller and its Predecessors (including their Officers, Directors, Employees, Stockholders, Agents, Partners and Principals) harmless from and against any claim, actions, suits or other actual proceedings, and all losses, judgments, damages, expenses or other costs (including all fees and disbursements of Counsel) incurred or suffered by Seller and its Predecessors by reason of negligent or willful misconduct or violation of any applicable law, rule or regulation by Buyer (or its employees or agents) in connection with the collection or enforcement of the Accounts.

SELLER'S INDEMNIFICATION.  Seller agrees to indemnify and hold Buyer (including their Officers, Directors, Employees, Stockholders, Agents, Partners and Principals) harmless from and against any claims, actions, suits or other actual proceedings, and all losses, judgments, expenses or other costs (including all fees and disbursements of Counsel) incurred or suffered by Buyer by reason of negligent or willful misconduct or violation of any applicable law, rule or regulation by Seller (or its employees or agents) in connection with the collection or enforceability or sale of Accounts.

6.2 LIMITATION OF LIABILITY. Seller and Buyer shall not be liable nor assume any obligation for incidental consequential or special damages of any kind, related to lost profit, lost revenue, cost of capital, use of capital and/or lost services.

6.3 NO CONFLICT. To the best of Buyer's knowledge, Buyer's review of Account and Debtor information will not represent a conflict of interest on the part of the Buyer or Buyer's officers or employees, and that neither Buyer nor any of Buyer's affiliated companies is presently a party to litigation, or involved in any litigation, with any Debtor or with the Seller or it's Predecessors.

6.4 NO BROKERS OR FINDERS. The Seller has not employed any investment banker, broker or finder in connection with the transaction contemplated in this Agreement who might be entitled to a fee or commission from the Seller upon consummation of the transaction contemplated in this Agreement. Any fee or commission due a broker or finder employed by the Buyer will be the responsibility of the Buyer. Buyer has not employed a broker, and is not responsible for any commissions.

6.5 COLLECTION OF ACCOUNTS. If Buyer collects or attempts to collect on any Account, Buyer will at all times:

(a) Comply with all state and federal laws applicable to debt collections including, the Consumer Credit Protection Act, the Fair Credit Reporting Acting and the Fair Debt Collection Practices Act; to the extent Buyer is subject to said laws and Acts.

(b) Shall not use the name of Seller or any of Seller's Predecessors in any way in the operation of its collection of the Accounts, including but not limited to checks, drafts, letters and forms except that Buyer may refer to an Account in the body of a Collection letter as an account purchased from Seller or originally issued by a predecessor of Seller. Buyer may refer to the Seller and its Predecessor as transferor in any lawsuit filed by Buyer.

6.6 NOTICE OF CLAIM. Buyer shall immediately notify Seller in writing of any claim against Seller or it's Predecessor that may come to its Buyer's attention.

6.7 BUYER'S REPRESENTATION OF CAPACITY. Buyer and/or the undersigned authorized agent of Buyer represents that all laws, rules, regulations, charter provisions and by-laws have been duly complied with and that such representative is duly authorized to act on behalf of and bind Buyer to the terms of this Agreement.

**ARTICLE VII**
SELLER OR IT'S PREDECESSOR AS A WITNESS

7.1 SELLER AS A WITNESS. If Buyer files legal action to collect on an Account and requests or subpoenas an officer or employee of the Seller to appear at a trial, hearing or deposition to testify about an Account, Buyer will pay the Seller for its time in traveling to, attending and testifying at the trial, hearing or deposition, whether or not the Seller is called as a witness, at the Seller's standard daily rate at a reasonable rate not to exceed $150.00 per hour. Buyer will also reimburse the Seller for the Seller's out-of-pocket travel-related expenses.

4

7.2 SELLER'S PREDECESSOR AS A WITNESS. Refer to/same as 7.1 (above).

**ARTICLE VIII**
USE OF THE ORIGINAL CREDITOR'S NAME

8.1 USE OF ORIGINAL CREDITOR'S NAME. Buyer and it's Successors will not use or refer to the Original Creditor's name for any purpose relating to any Account including, without limitation, the promotion, marketing or advertising of any Account. However, Buyer may use the Original Creditor's name for purposes of identifying an Account in communications with the Account's cardholder in order to collect amounts outstanding on the Account in accordance with Paragraph 9.1 below. Buyer may use the Original Creditor and Seller name as the transferor in any lawsuit filed by Buyer.

**ARTICLE IX**
MISCELLANEOUS TERMS

9.1 NOTICES. All notices and other communications between the parties will be in writing and will be deemed given when delivered personally or four (4) days after mailed by registered or certified mail, return receipt requested, to a party at its address set forth below, or to any other address as a party may designate in writing:

>    **TO BUYER:** F.D.I.C. Management Fund 37.5M
>    **ATTENTION:** Joe Pinsonneault
>
>    **TO SELLER:** AmeriWest Enterprises, Inc.
>    **ATTENTION:** William M. Evans

9.2 SUCESSORS AND ASSIGNS. This Agreement will bind and insure to the benefit of Buyer and the Seller and their respective successors and assigns.

9.3 EXPENSES. Except as otherwise expressly provided in this Agreement, Buyer and Seller will each dear its own out-of-pocket expensed in connection with the transaction contemplated by this Agreement.

9.4 ENTIRE AGREEMENT. This Agreement embodies the entire agreement and understanding between the parties and supersedes all prior agreements and understandings relating to the subject matter of this Agreement. The parties make no representations or warranties to each other, except as contained in this Agreement or the accompanying exhibits or the certificates or other closing documents delivered according to this Agreement. All prior representations and statements made by any party or its representatives, whether verbally or in writing, are deemed to have been merged into this Agreement.

9.5 AMENDMENT. Neither this Agreement nor any of its provisions may be changed, waived. discharged or terminated orally. Any change, waiver, discharge or


termination may be effected only by a writing signed by the party against which enforcement of such change, waiver, discharge or termination is sought.

9.6 GOVERNING LAW; SEVERABILITY. Oregon law governs this Agreement. If any one or more of the provisions of this Agreement, for any reason, illegal or unenforceable, the invalidity, illegality or unenforceability will not affect any other provision of this Agreement, and this Agreement will be construed without the invalid, illegal or unenforceable provision.

9.7 WAIVERS, etc. No waiver of any single breach or default will be deemed a waiver of any other breach or default of this Agreement. All rights and remedies, either under this Agreement or by law or otherwise afforded to a party, will be cumulative and not alternative.

9.8 HEADINGS. Paragraph headings are for reference only, and will not affect the interpretation or meaning of any provision of this Agreement.

9.9 COUNTERPARTS. This Agreement may be signed in one or more counterparts, all of which taken together will be deemed one original.

**IN WITNESS WHEREOF,** the parties have executed this Agreement by their duly authorized officers as of the date first shown above.

SELLER: AmeriWest Enterprises, Inc.

BY:  William M. Evans

DATE:  January 6, 1998

TITLE:  President & Chief Executive Officer

BUYER:  F.D.I.C. Management Fund 37.5M

X

BY:  Joe Pinsonneault

DATE: X

TITLE:  Portfolio Manager

termination may be effected only by a writing signed by the party against which
enforcement of such change, waiver, discharge or termination is sought.

9.6 GOVERNING LAW; SEVERABILITY. Oregon law governs this Agreement. If
any one or more of the provisions of this Agreement, for any reason, illegal or
unenforceable, the invalidity, illegality or unenforceability will not affect any other
provision of this Agreement, and this Agreement will be construed without the
invalid, illegal or unenforceable provision.

9.7 WAIVERS, etc. No waiver of any single breach or default will be deemed a waiver
of any other breach or default of this Agreement. All rights and remedies, either
under this Agreement or by law or otherwise afforded to a party, will be cumulative
and not alternative.

9.8 HEADINGS. Paragraph headings are for reference only, and will not affect the
interpretation or meaning of any provision of this Agreement.

9.9 COUNTERPARTS. This Agreement may be signed in one or more counterparts, all
of which taken together will be deemed one original.

**IN WITNESS WHEREOF,** the parties have executed this Agreement by their duly authorized
officers as of the date first shown above.

SELLER: AmeriWest Enterprises, Inc.

BY: William M. Evans

DATE: January 6, 1998

TITLE: President & Chief Executive Officer

BUYER: F.D.I.C. Management Fund 37.5M

X

BY: Joe Pinsonneault

DATE: X    JAN 8 / 98

TITLE: Portfolio Manager

This contract dated January 8, 1998 supercedes any and all other contracts made between
the parties.

6

# EXHIBIT "A"

<u>24,325</u> Accounts with a past due amount of <u>$37,500,725.30.</u>  Sale price <u>$562,510.87.</u>

Total of this Invoice  <u>$562,510.87.</u>

a)  one diskette (total inventory), of said portfolio.

b)  one print out (total inventory), of said portfolio.

Exhibit "B"

Closing Statement

Portfolio Invoice:  $37,499,159.52.

Number of Accounts:  24,221.

Outstanding Balance:  $37,499,159.52.

Purchase Price:  $562,510.87.

Purchaser shall pay to Seller, by wire transfer or otherwise immediately available funds.
the amount of 5 Hundred 62 Thousand 5 Hundred 10 Dollars and 87/100.

Funds may be wired as follows:

**Bank Name:**  Well's Fargo Bank

**Bank Address:**  1128 South Riverside Ave.
                   Medford, Oregon 97501

**ABA (Routing) Number:**  121-000-248

**Credit Bank Account Name:**  AmeriWest Enterprises, Inc.

**Credit Bank Account Number:**  0166-804195

**Description:**  Business

8

EXHIBIT "C"

PORTFOLIO INVOICE
ASSIGNMENT AND BILL OF SALE

AmeriWest Enterprises, Inc. ("Seller"), has entered into a F.D.I.C. Loan Portfolio Purchase Agreement, dated 6th day of January, 1998 ("Agreement") for the sale of Accounts described in "Exhibit A" thereof to F.D.I.C. Management Fund 37.5M. ("Buyer"), upon the terms and conditions set forth in that Agreement.

**NOW, THEREFORE,** for good and valuable consideration, Seller hereby sells, assigns, and transfers to Buyer, its successors and assigns, all of Seller's rights, title and interest in each and every one of the Accounts described in the Agreement.

Buyer and Seller agree that the Purchase Price shall be as stated in "Exhibit B", attached to the Agreement.

**IN WITNESS WHEREOF,** Seller has signed and delivered this instrument on the 6th day of January, 1998.

BY: _____
William M. Evans

TITLE: President & Chief Executive Officer

9

BLUEBIRD

Feb-24-98 12:27P                                                        P.01

## LOAN SALE AGREEMENT

THIS AGREEMENT, made this twelfth day of January 1998, by and between Fourscore Resource Capital L.L.C., 801 S. 1st St., Suite 260, Hopkins, MN 55343 / Collins Financial Services, Inc. 3532 Bee Caves Road, Suite 210, Austin, Texas 78746, a Texas corporation on behalf of itself and all of its affiliates (hereinafter referred to as "Seller"), and AmeriWest Enterprises, Inc. (hereinafter referred to as "Buyer").

*Broker #1*

*Broker #2*

1.   In consideration of $525,347.27 with considerations to be made by cashier's check or by wire transfer, the Seller hereby sells, assigns, transfers and conveys to Buyer without recourse, warranty, either expressed or implied, or liability except as herein expressly set forth, all those installment sale contracts, credit agreements, invoices, indebtedness, loans, or other obligations and any instruments securing same (hereinafter referred to as "Receivables") which are listed in Schedule A attached hereto and made a part hereof, except any thereof which shall have been paid to the Seller in full on or before the closing date of this sale. The above purchase shall include transfer to Buyer of all physical records and files in Fourscore Resource Capital L.L.C./ Collins Financial Services, Inc. possession relating to said Receivables.

2.   With respect to the above Receivables, the Seller warrants that in reliance upon documents and information furnished to it by Issuer and to the best of Seller's knowledge and belief:

   a.   It has complied, to the best of its knowledge and belief, with applicable federal, state and local laws, and regulations relating to the making and collection of the Receivables up to the date of the relevant sale.

   b.   It owns good and marketable title to all of the Receivables, free and clear of all liens and pledges.

   c.   It has full power and authority to sell, assign, transfer and convey the Receivables to the Buyer, and all other necessary proceedings on the part of the Seller have been duly taken to authorize the sale.

   d.   All of the Receivables were made for valuable considerations and are now legally enforceable obligations of the respective persons shown as indebted thereon, except as may be limited by statutes of limitations, bankruptcy, insolvency, moratorium, receivership, conservatorship, reorganization or similar laws affecting the rights of creditors generally or equitable principles limiting the right to obtain specific performance or other similar relief.

   e.   The persons shown as indebted on the Receivables have not initiated any lawsuits against Seller, and such persons have no legally enforceable rights to set-off, counterclaim, cancellation, or legally enforceable claim that the Receivables suffer

Loan Sale Agreement - Page 1

from lack of consideration, forgery or alteration of such person's signature, except as may be disclosed or contained in the relevant file or documents.

f.     The amounts shown on the hard copy and diskette to be owing and unpaid on the respective Receivables represent the amount that was represented to Seller by Issuer to be due. Upon written notice to seller by buyer, seller agrees to repurchase all bankrupt Chapter 7 Receivables, Receivables where the debtor is deceased without an estate, and previously settled Receivables within 60 days from the execution of the Loan Sale Agreement, for the same percentage of the net outstanding balance that Buyer paid for such Receivables, unless such condition was known by or disclosed to Buyer.

g.     There are no judgments against the Seller which could become a lien against the Receivables.

3.   Seller agrees that if, as to any of the Receivables, any of its warranties herein are breached or any claim or defense exists against Buyer arising out of a breach of any warranty herein, Seller will repurchase such Receivables on written demand with proof of the breach for the same percentage of the net outstanding balance that Buyer paid for such Receivables. Such repurchase shall be Buyer's exclusive remedy for any such breach.

4.   Buyer shall not assume or incur liability for any debt, or any other obligation of Seller, other than as herein provided.

5.   Buyer may advise debtors who are obligated on the Receivables that it has purchased such Receivables and that all payments thereon shall be made to the Buyer and all legal and other action respecting the Receivables shall be taken by Buyer in its own name and not the name of Seller.

6.   Seller hereby constitutes and appoints Buyer the true and lawful special attorney-in-fact of Seller in the name and stead of Seller, on behalf of and for the benefit of Buyer, to endorse the name the Seller without recourse upon all checks, drafts, notes, powers and other forms of exchange received as payment on any of the affected Receivables.

7.   Seller further agrees that any payments received by the Seller on said Receivables from and after the close of business on the date of this Agreement shall be turned over and delivered to Buyer at the time of the consummation of this Agreement. If such payments are received by the Seller after this Agreement is consummated, Seller shall as soon as practical turn them over to Buyer.

8.   The purchase and sale contemplated by this Agreement may be subject to the approval of certain regulatory authorities, and if so the parties agree to obtain such approval prior to the date of closing; otherwise, this Agreement shall be void at the other party's sole option.

9.  This agreement and any disputes arising under or as a result of the negotiation or execution of this agreement shall be governed by and its provisions construed under the laws of the state of Texas, and Federal laws where applicable.  Any disputes between the parties, of any kind or nature, shall be determined in the state or federal courts of Travis County, Texas and the parties do consent to the personal jurisdiction of such courts.  In any litigation between the parties to this agreement, the maximum recovery to the prevailing party shall be limited to the consideration given by that party under this contract, together with the prevailing party's reasonable and necessary attorney's fees.   In no event shall Seller be obligated to return any funds to Buyer unless Seller receives from Buyer all physical and electronic receivables to which such funds is attributable together with any sums collected by Buyer on such receivables.

10. Buyer represents and warrants to Seller that:

     a.     It is a sophisticated investor and its bid for and decision to purchase the Account Package (s) pursuant to this Agreement is and was based upon Buyer's own independent evaluation of the information made available by Seller to Buyer, and Buyer's independent evaluation of each Account Package (s).  Buyer has relied solely on its own investigation and not on any oral or written information provided by Seller or its personnel or agents other than information in the Account Package (s), the representations and warranties set out in Item # 2 of this Agreement, and the "Addendum to Loan Sale Agreement".  Buyer acknowledges that no employee or representatives of Seller has been authorized to make, and the Buyer has not relied upon, any statements other than those specifically contained in this Agreement, or in any Account Package (s).

     b.     It is qualified to transact business and duly licensed in all jurisdictions where necessary to purchase, hold, collect or enforce the Receivable or any amounts due thereon.

     c.     That it has full power and authority to purchase the Receivables from Seller and that all necessary proceedings on its part have been duly taken to authorize this purchase.

     d.     It will comply with all applicable laws, rules, regulations, ordinances and judgments relating to or in any way affecting the purchase of the Receivables by Buyer, the ownership thereof by Buyer or the collection or enforcement thereof by Buyer.

     e.     It will comply with all applicable laws, rules, regulations, ordinances and judgments relating to or in any way affecting its collection procedures.

     f.     It acknowledges that the Assets, the Asset Documents, and the Collateral, if any, may have limited or no liquidity.  Also, the Buyer has the financial wherewithal to own the Assets for an indefinite period of time and to bear the economic risk of an

4-98 12:28P                                                              P.04

outright purchase of the Assets and a total loss of the Purchase Price for the Assets. Buyer acknowledges that the Assets may be Unenforceable Assets.

g.    If it chooses to resell the accounts it will be to a sophisticated investor as represented in paragraph 10 a. and 10 f.

h.    Except as provided in paragraph 5 hereof, the relationship of the parties is solely that of seller and buyer and Buyer shall have no authority or capacity otherwise to bind or commit Seller to any act, obligation or liability, nor shall Buyer have any authority to bind Seller contractually.

i.    Buyer will indemnify and hold Seller harmless from any and all claims, demands, actions, causes of actions, suits, judgments, actual or punitive damages, statutory penalties, costs, fees and expenses arising from or in any way connected with Buyer's attempt(s) to collect on any Receivable or concerning the failure of Buyer to keep or comply with any term, condition, representation, warranty or agreement contained herein or the incorrectness or falsity of any representation or warranty, which is or becomes untrue in any material respect. The Seller will extend all of its rights to indemnification against the original creditor and/or prior owners of these receivables. The Seller agrees that the Buyer will have no responsibility and will be fully indemnified for all losses, judgements, damage, expenses, and/or other costs (including all fees and cost of legal counsel), for any acts or claims created by Seller.

j.    The parties will negotiate in good faith in an effort to resolve any dispute. Any controversy concerning this Agreement, which the parties cannot resolve within thirty days, will first be directed to mediation in Austin, Travis County, Texas at the Austin Dispute Resolution Center or any private mediator upon whom the parties agree with all expenses being shared equally by the parties. The mediation shall be conducted pursuant to the rules of the Texas Alternative Dispute Resolution Procedure Act (the "Act") and Chapter 154 of the Texas Civil Practice and Remedies Code (the "Code"). In the event the dispute is still not resolved through mediation then the dispute shall be settled by a mini-trial in State Court in Austin, Texas pursuant to the Act and the Code. Buyer waives right to trial by jury. The mini-trial shall be conducted as described in Section 154.024 of the Texas Civil Practice & Remedies Code and the parties shall select an impartial third party to conduct the mini-trial or, if the parties cannot agree, the third party shall be selected by and be a member of the Judicial Arbitration and Mediation Services. The parties agree that the award in the mini-trial shall be binding and may be reduced to judgment by any Travis County, Texas District Court and enforced as in the case of any other judgments.

11. This Agreement represents the entire agreement between the parties. There are no promises,

Loan Sale Agreement - Page 4

inducements, representations, or warranties not expressly stated herein. This Agreement may not be modified except by written instrument signed by all of the parties hereto. This Agreement supersedes any prior understandings or written or oral agreements between the parties respecting the Receivables, or the rights and obligations of the parties hereto.

ANY ADDENDUM OR EXHIBITS ATTACHED HERE TO BECOME A PART OF AND ARE INCORPORATED INTO THIS AGREEMENT.

By: Fourscore Resource Capital, L.L.C.          By: AmeriWest Enterprises, Inc.

By: Collins Financial Services, Inc.

### Addendum to Loan Sale Agreement

Conditions of this sale are as follows:

1.  Buyer agrees all communication and inquiry's directed to the Issuer(s) will be handled through Collins Financial Services, Inc. and agrees not to make contact with any representative of the Issuer(s).

2.  Any payments received from the Issuer(s) will be forwarded to Buyer via regular mail.

3.  Media may be ordered from Seller at cost and if available.

4.  Buyer has reviewed the accounts and Item 'B' and has satisfied himself as to the dates provided.


By: Fourscore Resource Capital, L.L.C.


By: Collins Financial Services, Inc.            By: Ameriwest Enterprises, Inc.

Loan Sale Agreement - Page 6

## ADDENDUM TO LOAN SALE AGREEMENT
## EXHIBIT A

### RECOURSE PROCEDURES

I.    All accounts submitted for recourse must meet qualifications as outlined in Addendum to Loan Sale, Exhibit B.

II.    Buyer agrees to provide Seller hard copy verification of collection activity on each account submitted for recourse.

III.    Buyer agrees to provide verification of Bankruptcy Discharge and Deceased as outlined in Addendum to Loan Sale, Exhibit B.

IV.    Buyer agrees to forward to Seller all files and documentation on qualifying recourse accounts as outlined in Addendum to Loan Sale, Exhibit B, no more than once monthly, on the first day of each month, at Buyers expense via the United States Postal Service or Overnight Mail Service to:

> Marloes Ligtenberg
> Collins Financial Services, Inc.
> 3532 Bee Cave Rd., Ste. 210
> Austin, Texas 78746

V.    Seller agrees to refund qualifying recourse accounts with the amount equal to the purchase price of that particular account to or accounts qualifying for recourse as outlined in Addendum to Loan Sale, Exhibit B.

VI.    Buyer must submit to Seller all qualifying recourse accounts on or before **Friday, March 13, 1998**. After that date no accounts will be accepted for recourse.

VII.    Buyer will appoint one of its employees to be the recourse liaison between Buyer and Seller, and Seller will appoint one of its employees as recourse liaison between Buyer and Seller for all recourse accounts.

_____
By: Fourscore Resource Capital, L.L.C.

_____      _____
By: Collins Financial Services, Inc.      By: AmeriWest Enterprises, Inc.

Loan Sale Agreement - Page 7

Feb-24-98 12:30P                                                          P.08

## ADDENDUM TO LOAN SALE AGREEMENT
## EXHIBIT B
## RECOURSE QUALIFICATIONS

### BANKRUPTCY - Discharge

1.    Account must have been discharged prior to the date of this Agreement.

2.    If there are two or more debtors on the same account, all debtors must have been discharged.

3.    Bankruptcy discharge must be verified by providing a copy of the discharge or following information necessary to verify the discharge.

      a.    Attorney Name

      b.    Attorney Phone Number

      c.    Case Number

      d.    Discharge date

### DECEASED

1.    Debtor must have been deceased prior to the date of this Agreement.

2.    If there are two or more debtors on the same account or the debtor is in a non-community property state, all debtors must be deceased.

### PAID IN FULL / SETTLED IN FULL

Verification must be provided.

### FORGERY / FRAUD

Verification must be provided by fraud or forgery affidavit.

Fourscore Resource Capital, L.L.C.

By: Collins Financial Services, Inc.                By: AmeriWest Enterprises, Inc.

Loan Sale Agreement - Page 8

Feb-24-98 12:30P

# Schedule A

### Closing Statement and Invoice

| | |
|---|---|
| Portfolio Invoice: | $525,347.27 |
| States: | Various |
| Number of Accounts: | 25,561 |
| Outstanding Balance: | $39,499,794.79 |
| Purchase Rate: | .0133 |
| Purchase Price: | $525,347.27 |

On, or before the Closing Date, Purchaser shall pay to Seller by check or by wire transfer or otherwise immediately available funds, the amount of Five-hundred twenty-five thousand, three hundred forty seven dollars and 27/100.

Funds must be wired as follows:

| | |
|---|---|
| Bank Name: | Wells Fargo Bank<br>609 Castle Ridge Road<br>Austin, Texas 78746 |
| ABA (Routing) Number: | 121000248 |
| Credit Bank Account Name: | Collins Financial Services, Inc. |
| Credit Bank Account Number: | 0745375667 |
| Description: | Company Account |

Loan Sale Agreement - Page 9

Feb-24-98 12:30p                                                    P.10

ITEM – B

Results For: **44Mil**          **Re-Scrub after Last Pay Field Update**



NOTES:

> This 'Scrub' report replaces the
> first one sent indicating dates of
> 1992 reflecting interest calculation
> dates.

## Debt Scrubber Totals

| Life Time Breakdown: | |
|---|---|
| Unavailable: | 11295 |
| < 6mo: | 2919 |
| >6mo and <1yr: | 1779 |
| >1yr and <2yrs: | 2762 |
| >2yrs and <3yrs: | 1926 |
| >3yrs and <4yrs: | 1310 |
| >4yrs and <5yrs: | 931 |
| >5yrs and <6yrs: | 550 |
| >6yrs and <7yrs: | 363 |
| >7yrs and <10yrs: | 1049 |
| >10yrs: | 1385 |
| Total # Accts | 26269 |

| | |
|---|---|
| Total Number of Accounts | 26,269 |
| Avgerage Balance | $1,548.78 |
| Total Balance | $40,681,801.42 |
| Weighted Average Last Payment | 4/6/88 |
| Average Last Payment Date | 4/23/88 |
| Average Charge-Off Date | 1/13/87 |
| Number of Accounts In-Statute | 0 |
| Number of Accounts Out-Statute | 26,269 |

| LastPay Breakdown: | |
|---|---|
| Unavailable | 11701 |
| LastPay Prior to '93: | 13854 |
| LastPay '93: | 648 |
| LastPay '94: | 22 |
| LastPay '95: | 26 |
| LastPay '96: | 11 |
| LastPay '97: | 1 |
| LastPay '98: | 0 |
| LastPay >='99: | 6 |
| Total # Accts | 26269 |

| C/O Breakdown: | |
|---|---|
| Unavailable: | 21496 |
| Charge Off Prior to '93: | 4720 |
| Charge Off '93: | 9 |
| Charge Off '94: | 16 |
| Charge Off '95: | 21 |
| Charge Off '96: | 7 |
| Charge Off '97: | 0 |
| Charge Off '98: | 0 |
| Charge Off >='99: | 0 |
| Total # Accts | 26269 |

| Balance Breakdown: | |
|---|---|
| Unavailable (Null): | 2 |
| Balance<1000: | 9417 |
| balance>$1000≤$2500: | 12730 |
| Balance>$2500≤$5000: | 3584 |
| Balance>$5000≤$10,000: | 536 |
| Balance>$10,000<$25,000: | 0 |
| Balance>$25,000: | 0 |
| Total # Accts | 26269 |

| Income Breakdown: | |
|---|---|
| Unavailable | 8,827 |
| < $10,000 | 89 |
| >=$10,000 and < $20,000 | 2,387 |
| >=$20,000 and < $30,000 | 6,427 |
| >=$30,000 and < $40,000 | 4,783 |
| >=$40,000 and < $60,000 | 3,346 |
| >=$60,000 and < $100,000 | 395 |
| >=$100,000 | 15 |
| Total # Accts | 26,269 |

b-24-98 12:31P                                                    P.11

## ASSIGNMENT AND BILL OF SALE

Fourscore Resource Capital, L.L.C./ Collins Financial Services, Inc. ("Seller") has entered into a Loan Sale Agreement, dated January 12, 1998 ("Agreement") for the sale of Accounts described in Schedule A thereof to AmeriWest Enterprises, Inc.(Buyer"), upon the terms and conditions set forth in that Agreement.

NOW, THEREFORE, for good and valuable consideration, Seller hereby sells, assigns, and transfers to Buyer all of Seller's rights, title and interest in each and every one of the Accounts described in the Agreement, provided however such transfer is made without any representations, warranties or recourse, except as provided in the Agreement.

Buyer and Seller agree that the Purchase Price shall be as stated in Schedule A, attached to the Agreement.

IN WITNESS WHEREOF, Seller has signed and delivered this instrument on the 12th day of Jan. , 1998.

                    Fourscore Resource Capital, L.L.C.

                    By:

                       Roger Knauf- ~~President~~ GENERAL PARTNER

                    Collins Financial Services, Inc.

                    By:

                       Walt Collins- President

Loan Sale Agreement - Page 15

FEB-24-98 TUE 14:05 COLORADO CAPITAL        817594140        P.

# LOAN SALE AGREEMENT

THIS AGREEMENT, made this twelfth day of January 1998, by and between Collins Financial Services, Inc. 3532 Bee Caves Road, Suite 210, Austin, Texas 78746, a Texas corporation/Fourscore Resource Capital. L.L.C., 810 S. 1st St., Ste. 260, Hopkins, MN 55343 on behalf of itself and all of its affiliates (hereinafter referred to as "Buyer"), and Colorado Capital Investments, Inc. (hereinafter referred to as "Seller").

1. In consideration of $ 410,797.87  with considerations to be made by cashier's check or by wire transfer, the Seller hereby sells, assigns, transfers and conveys to Buyer without recourse, warranty, either expressed or implied, or liability except as herein expressly set forth, all those installment sale contracts, credit agreements, invoices, indebtedness, loans, or other obligations and any instruments securing same (hereinafter referred to as "Receivables") which are listed in Schedule A attached hereto and made a part hereof, except any thereof which shall have been paid to the Seller in full on or before the closing date of this sale. The above purchase shall include transfer to Buyer of all physical records and files in Colorado Capital Investments, Inc. possession relating to said Receivables.

2. With respect to the above Receivables, the Seller warrants that in reliance upon documents and information furnished to it by Issuer and to the best of Seller's knowledge and belief:

    a.   It has complied, to the best of its knowledge and belief, with applicable federal, state and local laws, and regulations relating to the making and collection of the Receivables up to the date of the relevant sale.

    b.   It owns good and marketable title to all of the Receivables, free and clear of all liens and pledges.

    c.   It has full power and authority to sell, assign, transfer and convey the Receivables to the Buyer, and all other necessary proceedings on the part of the Seller have been duly taken to authorize the sale.

    d.   All of the Receivables were made for valuable considerations and are now legally enforceable obligations of the respective persons shown as indebted thereon, except as may be limited by statutes of limitations, bankruptcy, insolvency, moratorium, receivership, conservatorship, reorganization or similar laws affecting the rights of creditors generally or equitable principles limiting the right to obtain specific performance or other similar relief.

    e.   The persons shown as indebted on the Receivables have not initiated any lawsuits against Seller, and such persons have no legally enforceable rights to set-off, counterclaim, cancellation, or legally enforceable claim that the Receivables suffer

## LOAN SALE AGREEMENT

THIS AGREEMENT, made this twelfth day of January 1998, by and between Collins Financial Services, Inc. 3532 Bee Caves Road, Suite 210, Austin, Texas 78746, a Texas corporation/ Fourscore Resource Capital. L.L.C., 810 S. 1st St., Ste. 260, Hopkins, MN 55343 on behalf of itself and all of its affiliates (hereinafter referred to as "Buyer"), and Colorado Capital Investments, Inc. (hereinafter referred to as "Seller"). 

1.  In consideration of $ 410,797.87  with considerations to be made by cashier's check or by wire transfer, the Seller hereby sells, assigns, transfers and conveys to Buyer without recourse, warranty, either expressed or implied, or liability except as herein expressly set forth, all those installment sale contracts, credit agreements, invoices, indebtedness, loans, or other obligations and any instruments securing same (hereinafter referred to as "Receivables") which are listed in Schedule A attached hereto and made a part hereof, except any thereof which shall have been paid to the Seller in full on or before the closing date of this sale. The above purchase shall include transfer to Buyer of all physical records and files in Colorado Capital Investments, Inc. possession relating to said Receivables.

2.  With respect to the above Receivables, the Seller warrants that in reliance upon documents and information furnished to it by Issuer and to the best of Seller's knowledge and belief:

    a.   It has complied, to the best of its knowledge and belief, with applicable federal, state and local laws, and regulations relating to the making and collection of the Receivables up to the date of the relevant sale.

    b.   It owns good and marketable title to all of the Receivables, free and clear of all liens and pledges.

    c.   It has full power and authority to sell, assign, transfer and convey the Receivables to the Buyer, and all other necessary proceedings on the part of the Seller have been duly taken to authorize the sale.

    d.   All of the Receivables were made for valuable considerations and are now legally enforceable obligations of the respective persons shown as indebted thereon, except as may be limited by statutes of limitations, bankruptcy, insolvency, moratorium, receivership, conservatorship, reorganization or similar laws affecting the rights of creditors generally or equitable principles limiting the right to obtain specific performance or other similar relief.

    e.   The persons shown as indebted on the Receivables have not initiated any lawsuits against Seller, and such persons have no legally enforceable rights to set-off, counterclaim, cancellation, or legally enforceable claim that the Receivables suffer

from lack of consideration, forgery or alteration of such person's signature, except as may be disclosed or contained in the relevant file or documents.

f.  The amounts shown on the hard copy and diskette to be owing and unpaid on the respective Receivables represent the amount that was represented to Seller by Issuer to be due. Upon written notice to seller by buyer, seller agrees to repurchase all bankrupt Chapter 7 Receivables, Receivables where the debtor is deceased without an estate, and previously settled Receivables within 90 days from the execution of the Loan Sale Agreement, for the same percentage of the net outstanding balance that Buyer paid for such Receivables, unless such condition was known by or disclosed to Buyer.

g.  There are no judgments against the Seller which could become a lien against the Receivables.

3.  Seller agrees that if, as to any of the Receivables, any of its warranties herein are breached or any claim or defense exists against Buyer arising out of a breach of any warranty herein, Seller will repurchase such Receivables on written demand with proof of the breach for the same percentage of the net outstanding balance that Buyer paid for such Receivables. Such repurchase shall be Buyer's exclusive remedy for any such breach.

4.  Buyer shall not assume or incur liability for any debt, or any other obligation of Seller, other than as herein provided.

5.  Buyer may advise debtors who are obligated on the Receivables that it has purchased such Receivables and that all payments thereon shall be made to the Buyer and all legal and other action respecting the Receivables shall be taken by Buyer in its own name and not the name of Seller.

6.  Seller hereby constitutes and appoints Buyer the true and lawful special attorney-in-fact of Seller in the name and stead of Seller, on behalf of and for the benefit of Buyer, to endorse the name of the Seller without recourse upon all checks, drafts, notes, powers and other forms of exchange received as payment on any of the affected Receivables. Seller further agrees that any payments received by the Seller on said Receivables from and after the close of business on the date of this Agreement shall be turned over and delivered to Buyer at the time of the consummation of this Agreement. If such payments are received by the Seller after this Agreement is consummated, Seller shall as soon as practical turn them over to Buyer.

7.  The purchase and sale contemplated by this Agreement may be subject to the approval of certain regulatory authorities, and if so the parties agree to obtain such approval prior to the date of closing; otherwise, this Agreement shall be void at the other party's sole option.

8.  This agreement and any disputes arising under or as a result of the negotiation or execution of this agreement shall be governed by and its provisions construed under the laws of the state of

Texas, and Federal laws where applicable.  Any disputes between the parties, of any kind or
nature, shall be determined in the state or federal courts of Travis County, Texas and the parties
do consent to the personal jurisdiction of such courts.  In any litigation between the parties to this
agreement, the maximum recovery to the prevailing party shall be limited to the consideration
given by that party under this contract, together with the prevailing party's reasonable and
necessary attorney's fees.   In no event shall Seller be obligated to return any funds to Buyer
unless Seller receives from Buyer all physical and electronic receivables to which such funds is
attributable together with any sums collected by Buyer on such receivables.

9.  Buyer represents and warrants to Seller that:

    a.    It is qualified to transact business and duly licensed in all jurisdictions where
necessary to purchase, hold, collect or enforce the Receivable or any amounts due
thereon.

    b.    That it has full power and authority to purchase the Receivables from Seller and that
all necessary proceedings on its part have been duly taken to authorize this purchase.

    c.    It will comply with all applicable laws, rules, regulations, ordinances and judgments
relating to or in any way affecting the purchase of the Receivables by Buyer, the
ownership thereof by Buyer or the collection or enforcement thereof by Buyer.

    d.    It will comply with all applicable laws, rules, regulations, ordinances and judgments
relating to or in any way affecting its collection procedures.

    e.    It acknowledges that the Assets, the Asset Documents, and the Collateral, if any, may
have limited or no liquidity.  Also, the Buyer has the financial wherewithal to own
the Assets for an indefinite period of time and to bear the economic risk of an
outright purchase of the Assets and a total loss of the Purchase Price for the Assets.

    Buyer acknowledges that the Assets may be Unenforceable Assets.

    f.    Except as provided in paragraph 5 hereof, the relationship of the parties is solely that
of seller and buyer and Buyer shall have no authority or capacity otherwise to bind
or commit Seller to any act, obligation or liability, nor shall Buyer have any authority
to bind Seller contractually.

    g.    Buyer will indemnify and hold Seller harmless from any and all claims, demands,
actions, causes of actions, suits, judgments, actual or punitive damages, statutory
penalties, costs, fees and expenses arising from or in any way connected with Buyer's
attempt(s) to collect on any Receivable or concerning the failure of Buyer to keep or
comply with any term, condition, representation, warranty or agreement contained

herein or the incorrectness or falsity of any representation or warranty, which is or becomes untrue in any material respect. The Seller will extend all of its rights to indemnification against the original creditor and/or prior owners of these receivables. The Seller agrees that the Buyer will have no responsibility and will be fully indemnified for all losses, judgements, damage, expenses, and/or other costs (including all fees and cost of legal counsel), for any acts or claims created by Seller.

h.  The parties will negotiate in good faith in an effort to resolve any dispute. Any controversy concerning this Agreement, which the parties cannot resolve within thirty days, will first be directed to mediation in Austin, Travis County, Texas at the Austin Dispute Resolution Center or any private mediator upon whom the parties agree with all expenses being shared equally by the parties. The mediation shall be conducted pursuant to the rules of the Texas Alternative Dispute Resolution Procedure Act (the "Act") and Chapter 154 of the Texas Civil Practice and Remedies Code (the "Code"). In the event the dispute is still not resolved through mediation then the dispute shall be settled by a mini-trial in State Court in Austin, Texas pursuant to the Act and the Code. Buyer waives right to trial by jury. The mini-trial shall be conducted as described in Section 154.024 of the Texas Civil Practice & Remedies Code and the parties shall select an impartial third party to conduct the mini-trial or, if the parties cannot agree, the third party shall be selected by and be a member of the Judicial Arbitration and Mediation Services. The parties agree that the award in the mini-trial shall be binding and may be reduced to judgment by any Travis County, Texas District Court and enforced as in the case of any other judgments.

11. This Agreement represents the entire agreement between the parties. There are no promises, inducements, representations, or warranties not expressly stated herein. This Agreement may not be modified except by written instrument signed by all of the parties hereto. This Agreement supersedes any prior understandings or written or oral agreements between the parties respecting the Receivables, or the rights and obligations of the parties hereto.

ANY ADDENDUM OR EXHIBITS ATTACHED HERE TO BECOME A PART OF AND ARE INCORPORATED INTO THIS AGREEMENT.

By: Colorado Capital Investments, Inc.

By: Fourscore Resource Capital, L.L.C.

By: Collins Financial Services, Inc.

Loan Sale Agreement - Page 4

## Addendum to Loan Sale Agreement

Conditions of this sale are as follows:

1. Buyer agrees all communication and inquiry's directed to the Issuer(s) will be handled through Colorado Capital Investments, Inc. and agrees not to make contact with any representative of the Issuer(s).

2. Any payments received from the Issuer(s) will be forwarded to Buyer via regular mail.

3. Media may be ordered from Seller at cost and if available.

By: Colorado Capital Investments, Inc.

By: Fourscore Resource Capital, L.L.C.

By: Collins Financial Services, Inc.

FEB-24-98 TUE 14:10 COLORADO CAPITAL          817594140          P.07

## ADDENDUM TO LOAN SALE AGREEMENT
## EXHIBIT A

### RECOURSE PROCEDURES

I.      All accounts submitted for recourse must meet qualifications as outlined in Addendum to Loan Sale, Exhibit B.

II.     Buyer agrees to provide Seller hard copy verification of collection activity on each account submitted for recourse.

III.    Buyer agrees to provide verification of Bankruptcy Discharge and Deceased as outlined in Addendum to Loan Sale, Exhibit B.

IV.     Buyer agrees to forward to Seller all files and documentation on qualifying recourse accounts as outlined in Addendum to Loan Sale, Exhibit B, no more than once monthly, on the first day of each month, at Buyers expense via the United States Postal Service or Overnight Mail Service to:

> Colorado Capital Investments, Inc.
> 305 N.E. Loop 820, Ste. 604
> Hearst, Texas  76053

V.      Seller agrees to refund qualifying recourse accounts with the amount equal to the purchase price of that particular account to or accounts qualifying for recourse as outlined in Addendum to Loan Sale, Exhibit B.

VI.     Buyer must submit to Seller all qualifying recourse accounts on or before **Monday, April 13, 1998.** After that date no accounts will be accepted for recourse.

VII.    Buyer will appoint one of its employees to be the recourse liaison between Buyer and Seller, and Seller will appoint one of its employees as recourse liaison between Buyer and Seller for all recourse accounts.


By: Colorado Capital Investments, Inc.          By: Fourscore Resource Capital, L.L.C.

                                                By: Collins Financial Services, Inc.

By: Collins Financial Services, Inc.

Loan Sale Agreement - Page 7

## Schedule A

**COLORADO CAPITAL INVESTMENTS, INC.**
305 N.E. Loop 820 Ste. 604
Hearst, Texas 76053

Closing Statement and Invoice

| | |
|---|---|
| Portfolio Invoice: | $ 410,797.87 |
| States: | Various |
| Number of Accounts: | 25,561 |
| Outstanding Balance: | $39,499,794.79 |
| Purchase Rate: | $.0104 |
| Purchase Price: | $ 410,797.87 |

On, or before the Closing Date, Purchaser shall pay to Seller by check or by wire transfer or otherwise immediately available funds, the amount of Four-hundred ten thousand, seven hundred ninety seven dollars and 87/100 ($410,797.87).

Funds must be wired as follows:

| | |
|---|---|
| Bank Name: | Texas Commerce Bank |
| ABA (Routing) Number: | 113000609 |
| Credit Bank Account Name: | Colorado Capital Investments, Inc. |
| Credit Bank Account Number: | 07100833319 |
| Description: | Company Account |

Loan Sale Agreement - Page 8

## ADDENDUM TO LOAN SALE AGREEMENT
### EXHIBIT B
### RECOURSE QUALIFICATIONS

### BANKRUPTCY - Discharge

1.    Account must have been discharged prior to the date of this Agreement.

2.    If there are two or more debtors on the same account, all debtors must have been discharged.

3.    Bankruptcy discharge must be verified by providing a copy of the discharge or following information necessary to verify the discharge

Attorney Name

Attorney Phone Number

    c.    Case Number

    d.    Discharge date

### DECEASED

1.    Debtor must have been deceased prior to the date of this Agreement.

2.    If there are two or more debtors on the same account or the debtor is in a non-community property state, all debtors must be deceased.

### PAID IN FULL / SETTLED IN FULL

Verification must be provided.

### FORGERY / FRAUD

Verification must be provided by fraud or forgery affidavit.

By: Colorado Capital Investments, Inc.    By: Fourscore Resource Capital, L.L.C.

COLORADO CAPITAL INVESTMENTS, INC.

**ASSIGNMENT AND BILL OF SALE**

Colorado Capital Investments, Inc. ("Seller") has entered into a Loan Sale Agreement, dated January 12, 1998 ("Agreement") for the sale of Accounts described in Schedule A thereof to Collins Financial Services, Inc./Four Score Resource Capital L.L.C. (Buyer"), upon the terms and conditions set forth in that Agreement.

NOW, THEREFORE, for good and valuable consideration, Seller hereby sells, assigns, and transfers to Buyer all of Seller's rights, title and interest in each and every one of the Accounts described in the Agreement, provided however such transfer is made without any representations, warranties or recourse, except as provided in the Agreement.

Buyer and Seller agree that the Purchase Price shall be as stated in Schedule A, attached to the Agreement.

IN WITNESS WHEREOF, Seller has signed and delivered this instrument on the ____ day of

Colorado Capital Investments, Inc.

By: _____

Loan Sale Agreement - Page 9

## CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

### I. (a) PLAINTIFFS

SECURITY ASSETS CREDIT CORP., a California Corporation and sometimes dba FDIC MANAGEMENT FUND 37.5

### DEFENDANTS

AMERIWEST ENTERPRISES, INC., an Oregon Corporation; WILLIAM M. EVANS, an individual; COLLINS FINANCIAL SERVICE IN a Texas Corporation; and FOURSCORE CAPIR a Minnesota LLC, et al.

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  San Diego
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  Oregon
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Timothy H. Treadwell, Esq.
Treadwell, Marr & Schott
401 West "A" Street, Ste 2100
San Diego, CA 92101

ATTORNEYS (IF KNOWN)

FILED
'98 MAY 11 PM 1:3
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY ___ DEPUTY

### II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

### V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury-Med Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury-Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 640 R.R. & Truck | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 650 Airline Regs | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 660 Occupational Safety/Health | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 690 Other | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | **LABOR** | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 710 Fair Labor Standards Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Habeas Corpus | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |

### VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

28 U.S.C. §1332 ,

28.1332 bc

### VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A CLASS ACTION ☐ UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ YES ☐ NO

### VIII. RELATED CASE(S) IF ANY  (See instructions):

JUDGE ___   DOCKET NUMBER ___

DATE 5/6/98   SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # 038574   AMOUNT $150.00   APPLYING IPP ___   JUDGE ___   MAG. JUDGE ___